## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURIE FRUGE,

    *Plaintiff*,

  v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

    *Defendant*.

Civil Action No. 1:20-cv-02811 (CJN)

## MEMORANDUM OPINION

  Plaintiff Laurie Fruge claims that her former employer, the Board of Governors of the Federal Reserve System, unlawfully retaliated against her for making a series of protected disclosures related to misconduct or mismanagement by her supervisors and co-workers. The Board moves for summary judgment, arguing that few of Fruge's disclosures were protected, that there is no causal nexus between any protected disclosure and any adverse employment action, and that, as to the adverse actions it did take, it would have done so even absent her disclosures. The Court agrees and grants summary judgment to the Board.

### Background

  The Federal Reserve System, the nation's central bank, consists of the Board of Governors, the Federal Open Market Committee, and twelve regional Reserve Banks.[1] The Reserve Banks

---

[1] At the summary judgment stage, the Court reads the record in the light most favorable to the nonmoving party. But the parties agree that if the case proceeded beyond summary judgment, the factfinder would be the Court. The Seventh Amendment right to a jury trial does not apply to actions against the United States, *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981), and Congress did not provide for a right to a jury trial in 12 U.S.C. § 1831j or any other applicable statute.

are legally distinct entities with separate management.  The Board of Governors is a federal government agency divided into more than a dozen divisions.  One of those divisions is the Division of Reserve Bank Operations and Payment Systems (RBOPS).  It is responsible for overseeing Reserve Bank operations and issuing currency.  Eichner Decl. ¶ 1.

When Fruge permanently joined the Board in 2003, her direct supervisor was Michael Lambert.  Fruge Tr. at 13:13–15, 14:6–16.  After some restructuring, Lambert became her second-level supervisor.  *Id.* at 13:16–19, 14:17–20.  Fruge's first-level supervisors changed over the years, but beginning around 2011, her direct supervisor was Shaun Ferrari.  *Id.* at 14:1–11; Def.'s Ex. 10.

From 2003 to February 2019, Fruge worked as an analyst in the RBOPS Division, specifically in the Banknote Issuance and Cash Operations (BICO) group of the Cash Section. Fruge Tr. at 12:15–13:12.  She began as a Financial Services Analyst, grade 25, but in 2003 or 2004 she was promoted to Senior Financial Services Analyst, grade 26, and she remained in that grade level through her tenure with the Board.  *Id.* at 14:21–15:18.  Fruge audited the Reserve Banks' cash operations and at times participated in system-wide projects.  *Id.* at 16:5–22, 19:19– 20:7.  Her responsibilities involved travel to the banks to work on-site for days at a time and in total about three months out of a year.  *Id.* at 35:21–36:12.  For four Reserve Banks each year, the BICO team and RBOPS Division (and thus Fruge) would review the banks' currency operations and assess whether any issues merited a finding that something was amiss.  *Id.* at 20:8–21:2, 24:20– 26:12.  If a finding was made, it would be given one of four severity levels, ranging from minor to highly significant.  *Id.* at 28:7–12.  The severity levels lacked "clear-cut definitions," and reasonable minds could disagree on the appropriate level.  *Id.* at 28:7–29:17.  The BICO team

would recommend severity levels, which were submitted to Lambert and division leadership for review and approval.  *Id.* at 25:11–26:16.

Up through the 2014 review cycle, the Board rated employees under its Performance Management Program.  The review period ran from October through September, and employees would receive one of five ratings:  unsatisfactory, marginal, commendable, outstanding, or extraordinary performance.  *See* Def.'s Ex. 2 at 4737, 4743.  In nine review cycles, Fruge was rated "commendable," and in three she was rated "outstanding," including the reviews in 2013 and 2014.  Def.'s Exs. 2–13.

Fruge was often rated very highly for her job knowledge and her ability to manage her responsibilities.  *Id.*  But at the same time she was frequently criticized for her communication and interpersonal skills.  *Id.*  In 2003 and 2004, and again in 2009 and 2010, Fruge's reviewers raised significant concerns with her collegiality and perceived aggression and disrespect towards her colleagues.  Def.'s Exs. 2–3, 8–9.  As one example, Fruge's 2003 performance evaluation noted that she "demonstrates behavior that could easily be interpreted as disrespectful."  Def.'s Ex. 2 at 4743.  Fruge did make some effort to improve her communication and, despite some criticisms here and there, she was rated as "meet[ing] expectations" for her interpersonal skills from 2005 to 2014.  Def.'s Exs. 4–13.

Shaun Ferrari was hired at the Board around 2004 as a Junior Analyst and Fruge's co-worker.  Fruge Tr. at 50:5–20.  The two initially had a good working relationship.  *Id.* at 51:11–14.  But over time Fruge noted concerns with Ferrari's conduct, including his engaging in unnecessary business travel, coming to work late and hung over, and charging inappropriate expenses to the Board.  *Id.* at 53:13–58:20.  Fruge first reported her concerns to her supervisor, Lorelai Pagano, in about 2009.  *Id.* at 55:13–17.  Pagano told Fruge that she had discussed these

concerns with Lambert and Ferrari, but because there was no corroboration of the alleged misconduct, no action would be taken.  *Id.* at 57:18–59:14.

In the 2011 review cycle, Ferrari became Fruge's first-level supervisor and reviewer.  *See* Def.'s Ex. 10.  Ferrari noted in that year's review that "section and Reserve Bank staff at times describe[] Laurie as aggressive and argumentative," and that Fruge's apparent "lack of willingness to update management proactively and continued communication challenges with section and Reserve Bank staff are currently limiting her potential for advancement."  *Id.* at 4680–81; *see also* Def.'s Ex. 14 at 7008 (Vice President of Reserve Bank of Kansas City informing Ferrari that Fruge's audit approach "was operationally disruptive because of how demanding, openly critical and intimidating she was," noting that "she was quick to render a judgment before fully understanding a situation," and stating that she "was openly critical of staff performance, directly to them and to their coworkers").

Fruge's communication difficulties continued.  In 2012, Ferrari again emphasized that Fruge needed to improve her working relationships with Board and Reserve Bank staff.  Def.'s Ex. 11 at 6166.  The 2013 evaluation noted Fruge's progress.  Def.'s Ex. 12 at 6175.  But her 2014 evaluation stated that "communication among section members is at times strained."  Def.'s Ex. 13 at 6181.

Fruge often received feedback about her failure to keep her managers in the loop.  *See, e.g.*, Def.'s Exs. 4, 9–10.  And her reviewers commented about her inflexibility or lack of inclusion with regard to her colleagues' opinions about substantive work.  *See* Def.'s Ex. 10 at 4679; Def.'s Ex. 11 at 6165; *see also* Def.'s Ex. 15 at 1342 (Director of RBOPS Louise Roseman believed Fruge was "not politically astute," "not a people person," and she "viewed things as black and

white which resulted in her seeing things at the Reserve Banks as more extreme issues than others would have viewed them").

Jaclyn Hodges joined the Board in 2008.  Fruge Tr. at 59:19–20; Def.'s Ex. 19.  Over time, Fruge noticed that Hodges became very difficult to work with—constantly questioning decisions and trying to poke holes in presentations to the point of being abusive.  Fruge Tr. at 63:3–64:6, 66:8–15.  On one team project, Fruge and other team members went to Ferrari to try to remove Hodges because she was so difficult to work with.  *Id.* at 63:6–22.  Fruge describes Hodges's communication style as "very accusatory, very critical, very disruptive, very abrasive" towards nearly everyone, but she asserts that Hodges was much kinder to Ferrari and Lambert.  *Id.* at 65:17–67:1.

*     *     *

In late 2014 or early 2015, the division received the results of a "climate survey" and held a meeting to discuss the results.  *Id.* at 85:2–21.  At the division meeting, then-RBOPS Division Director Louise Roseman invited employees to meet with her regarding the results or any concerns they had.  *Id.* at 85:16–86:3.

Shortly thereafter, Fruge met with Roseman to raise a long list of workplace grievances.  *Id.* at 84:20–86:10.  At the meeting and in a document outlining her concerns, Fruge noted, *inter alia*, favoritism and poor leadership by Lambert (including inaccurate reviews of Fruge's performance); abuse and poor leadership by manager Genie Foster and Assistant Director Pagano; improper travel and mismanagement by Ferrari; and a romantic relationship between Ferrari and Hodges that Fruge asserted led to undeserved promotions, awards, and perks for Hodges.[2]  *See id.*

---

[2] For example, Fruge claimed that "Shaun [Ferrari] has promoted Jaclyn . . . despite her seeming lack of talent, skills or intelligence."  Def.'s Ex. 18 at 185.  Fruge also complained that Ferrari awarded Hodges a division award "despite the fact that she is universally despised and disrespected

5

at 86:8–10; Def.'s Exs. 17–18.  At this time, Ferrari was still Fruge's first-level supervisor and Lambert was her second-level supervisor.  Hodges was still Fruge's colleague in the BICO group; although she had begun her tenure a grade junior to Fruge in 2008, by that time she was two grades above Fruge.  Def.'s Exs. 1, 19.

Director Roseman referred the allegations to the head of Employee Relations, Allison Dichoso, and in February 2015 Dichoso questioned Ferrari about his conduct.  *See* Def.'s Exs. 18, 20–22.  The Employee Relations team also told Fruge that Ferrari and Hodges would be interviewed regarding the allegations.  *See* Def.'s Ex. 23; Fruge Tr. at 83:3–5.  Evidence suggests Ferrari and Hodges were informed about these allegations.  Fruge Tr. at 82:3–8; Def.'s Ex. 31.

Fruge raised an extensive list of issues, but the record suggests her primary focus was why certain individuals had been promoted while she had not.  *See* Def.'s Ex. 24; Def.'s Ex. 25 (requesting that Employee Relations investigate her non-promotion as well as the promotion practices in her division); *see also* Def.'s Ex. 23 at 431 (explaining Fruge's rejection of the suggestion to go to the Board's Equal Employment Opportunity group "if harassment was really the issue" and that Fruge "kept saying she does more than what her job involves and that she should be promoted"); Def.'s Ex. 26 at 273 ("[Fruge's] perception of a resolution is a reclass to grade 27.").  Employee Relations formally closed its inquiry in spring 2015.  Def's Ex. 21.

---

by every one of her co-workers." *Id.*  Fruge also recounted a business trip to San Francisco where Hodges "made a turn to go to a drug store," even though there was one next to their hotel, implying that Hodges instead met up with Ferrari since, "[a]fter an hour, she had still not returned to the hotel." *Id.*; *see also* Fruge Tr. at 130:8–132:21 (Fruge testifying in her deposition that she purposefully waited in the lobby to monitor Hodges's return even though she knew that Hodges had previously worked in San Francisco and had family there).  Fruge also claimed that Ferrari gave Hodges preferential treatment during a Miami trip because he "allowed her to rent a car" and to stay at a certain hotel, Def.'s Ex. 18 at 185, notwithstanding the fact that Board policy did not limit where an employee could stay and that Fruge could have also asked to rent a car but never did so.  *See* Fruge Tr. at 37:16–38:22.

After she reported her concerns to Roseman, Fruge noticed an uptick in Hodges's abrasive treatment of her, including more frequent, more severe, and more antagonistic comments than before.  Fruge Tr. at 67:2–68:8.  Hodges addressed some concerns she had regarding Fruge to Ferrari and Lambert, but she never made any formal complaints or involved Employee Relations. Hodges Tr. at 27:14–28:20.

For the 2015 review cycle, the Board changed its rating system to a new model called "3Cs Conversations."  Liu Decl. ¶ 4.  Employees were ultimately rated on two overall metrics:  *what* objectives the employee accomplished, and *how* the employee accomplished them.  *Id.*  Employees received one of four possible ratings:  "not meeting, meets most, achieves, or exceeds expectations."  *Id.*  The Board did not provide guidance about how the old system translated into the new system, but there was a rule of thumb that "commendable" and "outstanding" (the second and third highest ratings under the old system) correlated to "meets most" and "achieves" (the second and third highest ratings under the new system).  *Id.* ¶ 5.

In October 2015, Ferrari rated Fruge as Achieves/Meets Most—achieves for the "what" and meets most for the "how."  Def.'s Ex. 28 at 4752.[3]  Fruge believes this rating was "objectively lower" than her 2014 rating of "outstanding" under the old system.  Pl.'s Ex. 1 ¶ 11; Def.'s Ex. 13. In the course of developing the rating, Ferrari had received some negative feedback about Fruge from a Vice President at the Reserve Bank of San Francisco, who said she had a concern about Fruge's practice "of 'making stuff up' to fit a perception."  Def.'s Ex. 29 at 239.  When Ferrari tried to defuse this statement by calling it part of Fruge's "charm," *id.*, the Vice President responded:  "It is no longer charming.  My concern is the churn she is causing and the impact to

---

[3] In 2013 and 2014, Ferrari knew Fruge had previously reported allegations of his misconduct to other members of RBOPS management, but still rated Fruge as outstanding.  Def.'s Exs. 12, 13; Fruge Tr. at 54:22–59:6.  Fruge did not challenge those ratings.

others including me.  We have a solid process . . . , and she is tainting it with her perceptions and

negative comments." *Id.* at 238.  In Ferrari's telling, the same Vice President called Ferrari a few

weeks later and stated:

> [Fruge] says off-hand comments and treat[s] people like they are stupid.  She is
> very condescending.  She makes stuff up right and left which makes her messages
> not be heard.  It is like she has spiraled out of control.  This causes undue pressure
> and excess work for others and no one will speak up because they are fearful of
> [Fruge].

Def.'s Ex. 30 at 368 (quotation omitted).  Other Reserve Banks similarly noted the difficulties of

working with Fruge.  *See* Def.'s Exs. 31–32.

In Fruge's official review, Ferrari explained the meets most rating for the "how" metric

(recall—that is akin to "commendable" under the old system) by stating:

> Laurie  should  focus  on  competency  development  next  year,  particularly
> collaborative  relationships,  communications,  and  perspective  and  strategic
> agility. . . . On the how dimension, I would agree with her that her strengths are
> drive for excellence and decision quality.  As mentioned above, collaboration,
> communication, and perspective/strategic agility are the areas w[h]ere she meets
> most expectations and she can work on additional development. . . .
>
> Laurie  should  work  to  improve  her  credibility  by  using  less  emotion  in  her
> arguments and showing she can consider multiple points of view in her analysis.
> Laurie could strengthen her collaboration competency by accepting all points of
> view as valid and affirming team members' opinions by active listening.  She at
> times views issues as black and white and misses the nuances of situations or the
> strategic implications of decisions.

Def.'s Ex. 28 at 4749–51.

Fruge disputed her 2015 rating.  Def.'s Exs. 34–35.  After discussing it with Ferrari, some

language in the narrative was modified, but the rating remained the same.  Def.'s Ex. 36.  The

revised evaluation stated "Laurie achieved the high expectations of the Board this year.  Laurie

has  continued  to  maintain  an  overall  outstanding  performance  level,  always  successfully

accomplishing projects assigned and requiring very little guidance."  *Id.* at 531; *see* Def.'s Ex. 37.

In May 2016, Matthew Eichner replaced Roseman and became the new Director of the RBOPS Division.  Eichner Tr. at 9:6–13.  On June 27, 2016, a Board recruiter announced a new manager position in Fruge's group.  Def.'s Ex. 39; Fruge Tr. at 94:3–11.  The next day, Fruge met with Eichner to raise the same allegations about Ferrari that she had raised to then-Director Roseman, as well as allegations on more recent matters including, *inter alia*, Ferrari's marijuana use with a junior analyst while on business travel, and Ferrari's shirking his responsibilities at a two-day work meeting in Los Angeles—instead attending a non-essential meeting in New Jersey with Hodges, and then flying across the country to attend just three hours of the Los Angeles meeting.  Pl.'s Ex. 28; Def.'s Exs. 40–41; Fruge Tr. 95:4–16, 97:10–15.  Fruge hoped that her concerns would be looked into, but she did not believe her allegations would result in her becoming BICO manager.  Fruge Tr. at 99:10–21.  Director Eichner reviewed Fruge's submission and summarized:  "[Fruge] raise[d] a wide range of concerns.  Some of them are what I would describe as being sort of management culture, others really alleging significant conduct issues—in some cases, perhaps issues that might constitute criminal violations of the law."  Eichner Tr. at 16:13–19.  Eichner discussed Fruge's allegations with others.  In a series of exchanges with then-Assistant Director Jennifer Liu, Eichner stated:

> We may well have a problem with Laurie. . . . I am a little surprised that Laurie made these allegations before, they were apparently judged to be unfounded, yet there wasn't any sort of warning issued to her, or other action taken. . . .
>
> To me this is bigger than the "how" issue.  It is one thing to counsel someone on interpersonal skills, which indeed has apparently been an issue with Laurie.  It is another thing if an employee makes serious allegations of misconduct against a supervisor.  Seems to me that in such cases either the allegations are confirmed, in which case there are serious consequences for those accused of bad conduct.  Or the allegations are not confirmed in which case the employee making the charges presumably has some explaining to do.  In this case, it isn't clear to me that either of these things occurred.

Pl.'s Ex. 29 at 843.

Director Eichner referred the allegations to the Board's Office of Inspector General (OIG), which formally opened an investigation into Ferrari's conduct—specifically whether he smoked marijuana with a subordinate, traveled without sufficient business purpose, and provided preferential treatment to Hodges.  Def.'s Ex. 45.  In August 2016, Lambert informed Ferrari, Hodges, and other BICO team members about the OIG investigation.  Def.'s Ex. 42.  Fruge and two colleagues, Saacha Mohammed and Amanda Goldin, discussed Fruge's role in the initiation of the investigation, and Fruge expressed her distaste for her supervisors and Hodges.  *See* Def.'s Exs. 43–44.  After learning of the investigation, Hodges reported Fruge to Employee Relations and lodged a complaint against her.  Def.'s Ex. 42; Pl.'s Exs. 2–3.

During the 2016 performance review process, Ferrari sent a draft evaluation of Fruge to Employee Relations, initially proposing a Meets Most/Meets Most rating and then revising it up to Achieves/Meets Most in consultation with Employee Relations—the same rating as in 2015. Def.'s Exs. 46–47.  Liu recommended and Director Eichner agreed that Fruge should not be given a lower rating than in 2015.  *See* Def.'s Exs. 48–49.

Eichner reviewed Fruge's performance evaluation and made substantive edits.  Eichner Decl. ¶ 7.  He determined that Lambert—Ferrari's supervisor—would bear ultimate responsibility for Fruge's 2016 performance evaluation and would deliver her rating.  *See* Def.'s Ex. 50; Eichner Tr. at 33:4–14.  Eichner also instructed Lambert to issue an Achieves/Achieves rating—higher than in 2015 and equivalent to "outstanding" under the old system.  Def.'s Ex. 50.

The overall evaluation included feedback consistent with past reviews of Fruge's communication and interpersonal skills.  Def.'s Ex. 51.  Fruge was encouraged to "look for differing perspectives and opportunities to bring people along" and was told she "can increase her effectiveness by seeking communication styles that encourage alternative viewpoints, particularly

with peers." *Id.* at 4808, 4810.  The evaluation noted that some of the senior officers "agree with her knowledge of cash operations, but believe she could be much more effective by improving her method of communication." *Id.* at 4810.

Fruge protested her 2016 performance rating.  She met with Lambert twice.  Def.'s Exs. 53–54.  She provided a list of individuals who could provide feedback about her performance, but Lambert reported to RBOPS management that Federal Reserve staff, including some identified by Fruge, disagreed with her self-assessed performance.  Def.'s Exs. 55–57.  Lambert also communicated that Fruge strongly believed she deserved "exceeds expectations" (the highest rating) for the "what" dimension.  Def.'s Ex. 57.  Director Eichner approved Lambert's proposal to "agree to disagree," and Eichner emphasized that Fruge's final evaluation should focus on communication as the "key development objective for the next cycle." *Id.* at 1248.

The OIG investigation was largely concluded during these final performance discussions. Director Eichner met with an OIG investigator in late October 2016.  Eichner Decl. ¶ 4.  OIG interviewed Ferrari on November 21, 2016, after which he was immediately placed on administrative leave based on evidence of wrongdoing—including ███████████████████ ████████████████████████.  *Id.* ¶ 5; Def.'s Ex. 45.  Eichner decided to initiate Ferrari's separation, either through termination or resignation in lieu of termination.  Eichner Decl. ¶ 6.  On November 28, Eichner informed RBOPS officers and managers that Ferrari was on leave and stated that the issues related to Ferrari's conduct outside the office and on Board travel, and not the conduct of other Board employees.  Def.'s Ex. 58.[4]  Ferrari officially resigned on December 19, and RBOPS staff were informed the next day.  Def.'s Exs. 62–63.

---

[4] The OIG did not report any evidence of a romantic relationship between Ferrari and Hodges. Eichner Decl. ¶ 6; Def.'s Exs. 59–60; Fruge Tr. at 139:6–9.

Eichner believed that Ferrari's misconduct reflected poorly on Lambert's leadership. Eichner Tr. at 60:1–21. Eichner said as much to Lambert and that view was reflected in Lambert's performance rating and feedback. *Id.* at 60:1–62:11. Eichner also stated that Lambert and Marquardt (Lambert's supervisor) had a "tendency to blame people" for management problems including "of course Laurie," and they were sometimes overly harsh towards her. *Id.* at 63:14–65:6.

*     *     *

After the OIG investigation, Eichner sought to "help[] the cash group to heal," Def.'s Ex. 64 at 1173, but he communicated to the BICO staff that he "plan[s] to hold people accountable at all levels going forward." Def.'s Ex. 59 at 1143. In January 2017, a group of employees was up for promotion and Eichner and Liu discussed potentially promoting Fruge at that time. Eichner Tr. at 40:1–17. But Eichner decided against it because he suspected "it might take Michael [Lambert] some time to get his mind around the idea" of promoting Laurie, "[e]verything was, frankly, quite raw down there," and a new temporary manager was coming in to replace Ferrari. Pl.'s Ex. 30 at 1971; Eichner Tr. at 38:10–14, 42:3–13. Lambert was "not opposed" to Fruge's promotion but suggested waiting for the new manager's arrival. Def.'s Ex. 65. The decision to promote Fruge was deferred and she ultimately was not promoted. Eichner Tr. at 42:14–16.

The new temporary manager was Amy Burr, a Vice President at the Federal Reserve Bank of San Francisco. Eichner Tr. at 38:10–39:7; Burr Decl. ¶ 1. Fruge and Burr had known each other professionally for about twenty years, and they had a cordial professional relationship. Burr Decl. ¶ 3.

Burr asserts that, soon after starting, she noticed and received reports that Fruge did not listen to others' views, treated them disrespectfully, was insensitive, and avoided responsibility.

*Id.* ¶¶ 4–5; Def.'s Exs. 66–73.  Based on these concerns, Eichner directed Burr to draft a performance warning for Fruge and suggested requesting that Fruge attend an anger-management workshop.  Burr Decl. ¶¶ 5–6; Def.'s Ex. 73.  During this period, several incidents occurred in which Fruge's colleagues said she "blew up," was "increasingly defensive," and in particular had a hard time communicating politely with Hodges.  Def.'s Ex. 70 at 2150; Def.'s Ex. 71 at 2171.[5] Burr was working on a draft performance warning, but RBOPS management decided to document the concerns as part of the performance review process.  Burr Decl. ¶ 6.  Burr vetted the language with Employee Relations and Legal, which delayed Fruge's "mid-year" review until August 2017 (just two months before the annual review).  *Id.*  Burr conducted the review and followed up with written comments that included both praise and criticisms of Fruge's conduct.  Def.'s Ex. 81.

For the 2017 review cycle in October, Burr rated Fruge as Achieves/Meets Most for what/how respectively.  Def.'s Ex. 86.  Burr had calibrated standards with other RBOPS officers

---

[5] A Senior Employee Relations Specialist emailed Eichner and Liu that:

> Staff report that Laurie has a hard time addressing Jaclyn during meetings and that the tone Laurie uses when responding to Jaclyn is harsh.  Staff do not like going to staff meetings because the tension between Laurie and Jaclyn is palpable.
>
> Staff report that Jaclyn has been trying very hard to put the past events behind her and that working with Jaclyn has been pleasant and productive.  However, staff say that they have a hard time working with Laurie and they have a lack of trust in how Laurie interacts with them.  Staff reported that they feel torn between having to take sides with either Laurie or Jaclyn.  Staff feel uncomfortable speaking with Jaclyn as Laurie will ask why are they talking with Jaclyn and then she will stop speaking to them.  Staff report that this tension has negatively impacted their work productivity. . . .
>
> To conclude, the staff are not confident that Laurie and Jaclyn can continue to work together—or rather that Laurie is able to work with Jaclyn.  Staff believe that Jaclyn is willing to try and has tried, but that Laurie does not appear to be making any effort to put the past behind her and move on.  Laurie still seems to have a grudge and hard feelings against Jaclyn and it is noticeable.

Def.'s Ex. 60.

to ensure rating standards were being applied consistently across the division.  Def.'s Exs. 82–83.

Then-Deputy Director Marquardt agreed that the feedback from Burr supported the rating.  Def.'s

Exs. 82, 84.  Fruge also contested this rating and feedback, but Burr stood by it.  Def.'s Ex. 85.

Fruge brought her concerns about Burr's rating to Lambert.  Def.'s Ex. 88.  Fruge asserted

that the evaluation was inconsistent with the verbal feedback Burr provided throughout the year,

and was also false—Fruge was not, she said, "disrespectful," "insensitive," or "intimidating," and

she did not avoid responsibility or have a "reactive, siloed mindset."  Pl.'s Ex. 1 ¶¶ 22, 30

(quotation omitted); *see also* Pl.'s Ex. 4 (positive comments from co-workers).  Lambert declined

to accept Fruge's objections, so Fruge elevated her concerns to Eichner.  Def.'s Exs. 90–91.

Eichner agreed to meet with Fruge to share his "unvarnished views."  Def.'s Ex. 92 at 2514

(praising Burr's evaluation of Fruge for "sen[ding] exactly the right messages and in a nuanced

way" and for "commentary [that] is clear and speaks for itself").  After their meeting on December

14, 2017, Eichner reported that he instructed Fruge that "the quality of her interactions needs to be

consistently high."  Def.'s Ex. 93 at 2528.

Burr's rotation ended in January 2018, and in February, Hodges was promoted to manager

in the BICO group (thereby becoming Fruge's direct supervisor).  Burr Decl. ¶ 2; Hodges Tr. at

9:17–10:3, 78:17–79:4; Def.'s Exs. 19, 94.  Fruge had not applied to the position.  Eichner Tr. at

67:1–9.  Eichner emailed the BICO staff about his commitment to supporting the team, and he

provided an outside facilitator, David Osborne, "to achieve greater alignment on strategic

objectives" and "foster the type of environment you all wish to work in."  Def.'s Ex. 95 at 2845.

Fruge asserts that Hodges became increasingly abusive and harassing once she became

manager.  Fruge Tr. at 67:5–68:5.  Amanda Goldin (another analyst) told Fruge that "Jaclyn

[Hodges] is mean to everybody, but you get it 100 times worse than anybody."  *Id.* at 67:14–17.

Osborne saw it differently.  Upon his assignment he quickly reported that he perceived the interactions between Fruge and Hodges as a major contribution to the "dysfunction" in the BICO team.  Def.'s Ex. 97 at 3073.  Osborne told Lambert that he was hearing that Fruge was resisting Hodges's leadership.  Def.'s Ex. 99; *see* Fruge Tr. at 222:9–21.  As a few examples, Fruge would telework or take leave without telling Hodges, and she did not keep Hodges updated about the team's activity while working at the Cleveland Reserve Bank.  Def.'s Exs. 107, 115.  Fruge also declined being trained to be a back-up for one of the Board's critical functions.  *See, e.g.*, Def.'s Exs. 117–19.

A number of other individuals raised issues about Fruge early in Hodges's tenure as manager.[6]  Several members of the Reserve Bank of Cleveland expressed concerns to Hodges that Fruge might allow personal feelings to bias the upcoming review of the bank.  *See, e.g.*, Def.'s Ex. 103 (concerns about personal bias affecting the review process); Def.'s Ex. 106 at 2951 (meeting with Fruge "did not go very well" because Fruge was "fairly adamant on her views"); Def.'s Ex. 107 (Senior Vice President informing Hodges that communication broke down with the Cash group).  As one example, Senior Vice President Mouneer Ahmad's view was that Fruge's "unwillingness to consider alternative viewpoints created a culture of fear."  Ahmad Decl. ¶ 3. Moreover, Hodges received feedback that Cleveland staff believed an open discussion could not be had without Fruge becoming "very defensive and upset."  Def.'s Ex. 107 at 2960; *see also* Def.'s Ex. 108 at 3127 (showing that Hodges "heard from the Cleveland Reserve Bank cash

---

[6] Burr was out of her rotation with the Board, but continued to have concerns about Fruge.  *See* Def.'s Ex. 108 at 3128 (explaining that Fruge "listened to her colleagues with the goal of refuting, rather than understanding, their perspectives and demonstrated no willingness to entertain the idea that an alternate perspective might have merit"); Def.'s Ex. 112 at 3037 (agreeing that she could "see someone feeling like [Fruge] is fishing for a gotcha"); Def.'s Ex. 113 at 3106 (noting reports that Fruge "was 'blowing things out of proportion' and embellishing," causing credibility issues).

management team that [Fruge] was less than collaborative and unreceptive to listen to their perspective regarding the issues").[7]

Fruge's feedback was not exclusively negative, however. Burr, while no longer Fruge's manager, commented in early April that she'd heard of "some green shoots of personal growth" and that Fruge had "gotten good buzz about being easy to work with" on a project. Pl.'s Ex. 32 at 3165.

*      *      *

In mid-April 2018, Director Eichner, Deputy Associate Director Liu, and Osborne discussed the situation with Fruge and Hodges. Eichner emailed with regards to Fruge:

> I have had some conversations with our employment counsel. I have a lot of respect for Laurie's experience and intellect. But I am not willing to allow what appears to me to be a continuing and fundamental lack of respect for Jaclyn [Hodges], and unwillingness to recognize that she is now the manager of the BICO section, to continue. My inclination is to express those sentiments directly and clearly to Laurie, and then to begin a process of managing her out. But I would be very interested in your impressions of the situation after [Osborne's] conversation [with Fruge] tomorrow.

Def.'s Ex. 100 at 3247; *see* Eichner Tr. at 79:20–80:22. Osborne agreed with Eichner's views on Fruge and his proposal for next steps. Def.'s Ex. 100 at 3246; Def.'s Ex. 101 at 3260 (Eichner's notes of Osborne's takeaways from his conversation with Fruge, including that she had "[n]o basic level of respect as precondition," the conversation "[p]retty quickly escalated to her becoming visibly angry—name calling 'abusive, power-hungry individual,'" and "[n]o openness; very

---

[7] These concerns persisted for several months. For example, in May, Ahmad brought additional concerns to Hodges that Fruge was not "collaborative," which he believed "led to an overly negative tone about cash operations in the draft report." Ahmad Decl. ¶ 5; Def's Ex. 109. He raised similar concerns to a different manager at RBOPS, explaining that Fruge "often cut conversations short, did not allow for dialogue on findings, and did not act in a collegial manner." Ahmad Decl. ¶ 6; *see* Def.'s Ex. 110.

hostile"). Eichner communicated his and Osborne's views to Fruge's management chain. Def.'s Ex. 102.

Later that month, Eichner decided that Fruge should be issued a performance warning. *See* Def.'s Ex. 82 at 6. He emailed section leadership requesting examples that included the period before Hodges became manager. Pl.'s Ex. 16 at 3305 ("It isn't critical but the more that we can point to a broader pattern that extends back before [Hodges's] appointment, the stronger our position. It is easier to tell a story that involves similar concerns arising under multiple managers."). Burr and Hodges crafted the performance warning and kept Fruge's management chain updated throughout the process. Def.'s Ex. 82 at 6; Def.'s Ex. 120.[8] Lambert provided some input, and Liu and Senior Employee Relations Specialist Keisha Hargo reviewed the warning in advance of issuance. Def.'s Ex. 82 at 6.

On May 29, 2018, Hodges, Lambert, and Hargo delivered the performance warning to Fruge. Def.'s Ex. 120. The final version was 13 pages long and detailed Fruge's performance problems, with specific examples provided under Burr's leadership and after. Def.'s Ex. 121. The warning referenced many of the 2017 and 2018 issues set forth above, including a significant discussion about the Cleveland Reserve Bank review, as well as additional concerns. *See id.* The performance warning featured headings including "Poor Communication and Collaboration," "Lack of Drive for Excellence," and "Failure to Follow Instructions." *Id.* at 3542, 3547, 3549. The warning's conclusion noted expectations going forward and that Fruge might be separated from Board employment if she did not improve within the next six months. *Id.* at 3550–51.

---

[8] Fruge asserts that Burr did not think Fruge's performance warranted a performance improvement plan. *See* Pl.'s Opp. at 19 (citing Pl.'s Exs. 16–18). But, while the cited evidence shows Burr communicated that she "did not have particular *insubordination* issues with [Fruge]," Burr went on to note other issues to be included in the performance warning and participated in drafting it. *See* Pl.'s Ex. 17 at 3306 (emphasis added); Def.'s Ex. 82 at 6.

Fruge was reportedly "shocked."  Def.'s Ex. 120 at 3482.  She appealed her performance warning to Eichner.  Def.'s Ex. 122; Pl.'s Ex. 1 ¶¶ 31–32; Pl.'s Ex. 5.  She disputed the factual allegations and told him she felt the warning was retaliation for her prior disclosures.  Pl.'s Ex. 1 ¶¶ 31–32.  Eichner reviewed the allegations and supporting documents, met with Fruge, and solicited additional verification for some points on which she had been adamant.  *See* Def.'s Exs. 124–25; Eichner Tr. at 97:1–103:9.  He ultimately upheld the warning.  Def.'s Ex. 122.

*     *     *

In mid-May 2018, the Board hired Brian Lawler as an Assistant Director to supervise BICO—placing him above Hodges.  Lawler Tr. at 8:18–9:18.  Lawler did not participate in the issuance of Fruge's performance warning or the appeal.  *Id.* at 17:3–15; Def.'s Ex. 126.  He was aware that there had been an OIG investigation, but did not know "who was the subject of it or who had been a contributor to that."  Lawler Tr. at 18:12–19:1.

Fruge continued to have problems under Lawler's leadership.  Eichner Tr. at 122:15–123:6.  In the first month, Lawler viewed Fruge as having a high degree of knowledge but some difficulties in her analysis and recommendations.  Lawler Tr. at 20:19–21:21.  And Fruge continued to have interpersonal issues.  Lawler testified in his deposition that Fruge "responded very poorly, very defensively to even questions, let alone feedback about her work," and "often treat[ed] her teammates in a hostile manner."  *Id.* at 31:10–15.  After one particularly poor email communication, Eichner informed Lawler he had the discretion to suspend Fruge's participation on her current Reserve Bank review.  Def.'s Ex. 128.  Lawler sent a written reprimand to Fruge:  "[S]ome of the emails you have sent to colleagues are not appropriate.  That needs to stop.  Diverting conversations with teammates on our work and into discussing your performance

warning - this is not appropriate. . . . Confronting a colleague in this manner again could be misconduct." Def.'s Ex. 130.

Fruge's problems with Hodges continued. *See, e.g.*, Lawler Tr. at 56:22–57:2 ("In my observation, Laurie didn't seem to react very favorably to having a team member now be her manager."). For example, Fruge asserts that she cried out of frustration after a meeting in which Hodges accused her of not keeping an assistant informed of certain events. Fruge Tr. at 115:6–117:5. After another meeting with Fruge, Eichner reported that Fruge had a "hard time answering" when pressed about whether she was "committed and willing to work with [Hodges]." Def.'s Ex. 131 at 3985.[9]

In mid-August 2018, Fruge met with Lawler and an Employee Resources representative to complain that Hodges was providing "harassing" feedback on her work product. Pl.'s Opp. at 24, ECF No. 23; *see* Def.'s Exs. 133–34; Pl.'s Ex. 33. Lawler alerted RBOPS leadership. Pl.'s Ex. 33. Liu told Eichner that she believed Hodges's comments were completely professional:

> It's not a surprising move from an employee going through the performance warning process. After getting your decision on the appeal, Laurie is trying to find ways to put pressure on [Hodges] and Brian [Lawler]. As I told Brian, at the end of the day, her performance warning stands and, it is he and Jaclyn's job to continue providing Laurie feedback about her work products and conduct. As you can see from Brian's attachment, the comments and edits from Jaclyn to Laurie are all focused on the work product – no personal attacks or remarks of any kind.

Def.'s Ex. 135 at 4095. Eichner agreed that Hodges's feedback was "routine." *Id.* at 4094; *see also* Eichner Tr. at 108:3–6. Lambert told Lawler that Marquardt thought Hodges's comments were "overly critical" of Fruge. Pl.'s Ex. 20 at 4105. After consulting with various support staff,

---

[9] As a result, Eichner and Hargo "both expressed the view that this is headed for separation." Def.'s Ex. 132 at 3999.

Lawler formally responded on August 31, 2018, that he did not find Hodges's feedback "harassing nor abusive." Def.'s Ex. 137 at 4237.

On September 28, 2018, the team met to discuss the ongoing review of the Chicago Reserve Bank. Fruge Tr. at 243:13–21. Fruge was the lead reviewer on the project. *See* Def.'s Ex. 142. At the meeting, Fruge summarized the draft report and Hodges gave her the "usual pushback" against her findings and recommendations. Fruge Tr. at 244:2–14. Lawler also observed Fruge berate Peter Niebyl (another analyst) and be dismissive to other teammates. Def.'s Ex. 82 at 6; *see* Def.'s Ex. 140.

On October 2, 2018, Lawler met with Fruge and discussed her behavior. Def.'s Ex. 82 at 6. According to Lawler, Fruge became aggressively defensive and claimed that her teammates undermined her. Def.'s Ex. 150. The next day, Lawler informed Fruge that she would not continue her role as lead reviewer. Def.'s Ex. 82 at 6–7; Def.'s Ex. 142.

Also on October 3, 2018, Eichner concluded it was necessary and appropriate to begin the separation process. Def.'s Ex. 141. Fruge complained about her removal from the Chicago review, and asserted Lawler was "cruel, unprofessional, and abusive," but it was Eichner's view that she should look for another job. Def.'s Ex. 143 at 4435, 4437.[10]

Lawler and Hodges then drafted Fruge's 2018 performance review and performance warning feedback, concluding that Fruge was not meeting expectations (the lowest rating). *See* Def.'s Exs. 144–46. On October 31, 2018, Fruge received a Performance Warning Feedback

---

[10] With one exception, Fruge lodged complaints about each and every direct supervisor that she had throughout the duration of her employment at the Board from 2003 to 2019: Michael Lambert, Genie Foster, Lorelai Pagano, Shaun Ferrari, Amy Burr, Jaclyn Hodges, and Brian Lawler. *See, e.g.*, Def.'s Exs. 41, 91.

Memorandum, which asserted that Fruge was not meeting expectations and described her performance deficiencies.  Def.'s Exs. 146–47.

Lawler then made the decision to propose Fruge's separation, with support from Eichner and Liu.  Def.'s Ex. 82 at 4; Def.'s Exs. 148–49.  On December 14, 2018, Lawler issued Fruge another Performance Warning Feedback Memorandum, which explained that her performance continued to fail to meet expectations, and formally proposed her separation from the Board.  Def.'s Exs. 150–51.  The memorandum included Lawler's personal observations and interactions with Fruge, feedback he received from officers at several Reserve Banks, and Fruge's defensive reactions to his feedback.  Def.'s Ex. 150; Def.'s Ex. 82 at 4; *see* Lawler Tr. at 31:15–32:11.

On January 4, 2019, Fruge, assisted by counsel, submitted a response, attaching a number of exhibits the Board had classified as restricted.[11]  Def.'s Exs. 153–54.  On January 23, 2019, Lawler amended Fruge's separation notice, adding a "wholly separate and distinct basis" for separation—Fruge's improper disclosure of restricted information without prior authorization.  Def.'s Ex. 155 at 5066.

On February 14, 2019, Eichner sustained the decision to separate Fruge from the Board.  Def.'s Ex. 156.  Eichner made his decision in a letter that replied to the points Fruge had made in response.  *Id.*

\*       \*       \*

On October 2, 2020, Fruge filed this suit.  Compl., ECF No. 1.  She alleges that she was retaliated against in violation of 12 U.S.C. § 1831j.  She asserts four claims, each alleging that

---

[11] The Board's "Restricted FR" classification "applies to information that, if disclosed to or modified by unauthorized individuals, might result in the risk of significant monetary loss, significant productivity loss, or cause a significant negative impact to the Board's ability to perform its mission."  Def.'s Ex. 152 at 5078.

separate conduct was retaliatory:  (1) her termination, (2) the October 31, 2018 Performance Warning Feedback Memorandum, (3) the December 14, 2018 Performance Warning Feedback Memorandum, and (4) a hostile work environment and harassment from October 2015 to her separation.  After extensive discovery by both parties, the Board now moves for summary judgment, asserting that Fruge cannot establish a prima facie case of retaliation because she cannot prove that any protected disclosure was a contributing factor to any adverse action.  The Board also argues that, even absent her disclosures, the Board would have terminated Fruge.  *See generally* Def.'s Mot., ECF No. 18.

### Legal Standards

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is not "genuine" unless the evidence is such that a reasonable factfinder—here, the Court[12]—could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the moving party has met its burden, the nonmoving party must then set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation omitted).  Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252.  In other words, "there must be evidence on which the [factfinder] could *reasonably* find for" the nonmoving party.  *Id.* (emphasis added).  "[C]onclusory allegations" and "unsubstantiated

---

[12] *See supra* note 1.

speculation" will not suffice to create genuine issues of material fact. *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 3d 143, 149 (D.D.C. 2020) (quotations omitted).

### Analysis

For claims brought under 12 U.S.C. § 1831j, the whistleblower antiretaliation provision that applies to the Federal Reserve, a burden-shifting framework applies. *See* 12 U.S.C. § 1831j(f) (adopting burdens of proof in the Whistleblower Protection Act); *Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1278–79 (11th Cir. 2006). A plaintiff must first establish that her protected disclosure of information was a "contributing factor" resulting in an adverse employment action. 5 U.S.C. § 1221(e)(1). That consists of three analytical steps: (1) identifying which disclosures are protected, (2) identifying what adverse employment actions occurred, and (3) demonstrating a causal nexus between the protected disclosures and the adverse action. The burden then shifts to the defendant to demonstrate by clear and convincing evidence that the employment action would have been taken irrespective of the disclosure by the employee. *Id.* § 1221(e)(2).

### I.    Fruge Has Failed to Make a Prima Facie Case of Retaliation.

### A.    Few of Fruge's Disclosures Are Protected by 12 U.S.C. § 1831j.

The parties agree that the only relevant protection for disclosures comes from 12 U.S.C. § 1831j(a)(2). But the parties disagree about what the provision means. The statute provides:

> No Federal banking agency . . . may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to any such agency . . . regarding any *possible* violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety by . . . (C) any officer or employee of the agency which employs such employee . . . .

12 U.S.C. § 1831j(a)(2) (emphasis added).

Fruge contends that this provision protects disclosures of "possible" violations of law, as well as possible gross mismanagement, possible gross wastes of funds, and possible abuses of authority.  *See* Pl.'s Opp. at 24–26.  Fruge contrasts this provision with the one immediately preceding it, § 1831j(a)(1).  That provision applies to employees of depository institutions and separates out "a possible violation of any law or regulation" from "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety"—putting them in entirely different subparagraphs:

> No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . . provided information to any Federal banking agency . . . regarding-
>
>> (A) a possible violation of any law or regulation; or
>>
>> (B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;
>
> by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. § 1831j(a)(1).  Fruge also suggests that Congress could well have intended stronger whistleblower protections for banking agencies than for depository institutions.  *See* Pl.'s Opp. at 25–26 (citing *Haley v. Fiechter*, 953 F. Supp. 1085, 1092 (E.D. Mo. 1997) ("Courts which have been called upon to interpret different federal whistleblower statutes have uniformly held that such statutes should be broadly construed, even where the conduct involved did not come under the literal terms of the statute, in order to further their remedial purposes.")).

The Board argues that paragraph (a)(2)'s text carries forward the same semantic division as paragraph (a)(1)'s structure.  Def.'s Mot. at 30–32.  In the Board's view, the adjective "possible" modifies only the phrase "violation of any law or regulation."  And, the Board argues, only disclosures of *actual* instances of gross mismanagement, gross wastes of funds, or abuse of authority are protected.  As a result, the "reasonable belief" standard common to other

whistleblower statutes is not present here (except, perhaps, for violations of any law or regulation).  *See Barcomb v. Gen. Motors LLC*, 978 F.3d 545, 549 (8th Cir. 2020) (holding that a statute did not protect an employee who reasonably but erroneously believed that he was disclosing a manufacturing defect because the statute lacked the "reasonably believes" language present in comparable federal whistleblowing provisions); *see also Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (warning that courts should avoid reading language into statutes that Congress chose to omit).  The Board also states that "federal whistleblower provisions were 'not intended to apply to disclosure of trivial or *de minimis* matters.'"  Def.'s Mot. at 32 (quoting *Crews v. Dep't of the Army*, No. 99-3182, 1999 WL 825132, at *2 (Fed. Cir. 1999)).

The Court largely agrees with the Board's interpretation of the statute.  While there is a structural difference between paragraph (a)(1) and paragraph (a)(2), the text of paragraph (a)(2) favors the Board's reading.  The adjective "possible" cannot naturally be read to modify the full list.  Subsequent items of the list begin with articles, and it's simply ungrammatical to say "any possible . . . *a* gross waste of funds," "any possible . . . *an* abuse of authority," or "any possible . . . *a* substantial and specific danger to public health or safety."  To be sure, the second item on the list, "gross mismanagement," is not preceded by an article.  But while an adjective preceding a list may modify either the first item or each item on the list, it is unnatural to read the adjective to cover some but not all items.  The Court therefore concludes that the statute protects disclosures regarding a possible or actual violation of any law or regulation, as well as disclosures about *actual* gross mismanagement, an *actual* gross waste of funds, an *actual* abuse of authority, and an *actual* substantial and specific danger to public health or safety.

The Court also agrees with the Board that the statute only protects disclosures of more than *de minimis* significance.  As the Supreme Court has recognized:  "[T]he venerable maxim *de*

*mininis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992). The Court of Appeals has applied this principle to employment law, ruling that "[t]he federal courts cannot be wheeled into action for every workplace slight, even one that was possibly based on protected conduct." *Taylor v. FDIC*, 132 F.3d 753, 765 (D.C. Cir. 1997). And the maxim is particularly apt in the context of whistleblower protections. Such measures were "enacted to protect employees who report genuine infractions of law, not to encourage employees to report arguably minor and inadvertent miscues occurring in the conscientious carrying out of one's assigned duties." *Frederick v. DOJ*, 73 F.3d 349, 353 (Fed. Cir. 1996). As the Federal Circuit has explained, overly sensitive applications of whistleblower protections would prove unworkable:

> If supervisors have to fear that every trivial lapse in their own behavior will be the subject of a whistleblowing complaint when they critically appraise their employees, as they are obligated to do, they will be deterred from carrying out honest appraisals. Poor performers will be protected by any minor lapse in a supervisor's conduct.

*Id.* Fruge does not dispute that the statute only protects disclosures alleging more than *de minimis* wrongdoing. *See* Pl.'s Opp at 28–29.

Applying these standards, the Board argues that the only protected disclosures by Fruge are Ferrari's marijuana consumption and his charging purely personal travel expenses to the Board. Def.'s Mot. at 33–36; Def.'s Reply at 4, ECF No. 31; *see* Def.'s Ex. 41. The Board concedes that these disclosures raised possible violations of law or regulation but contends that all other allegations fall short.

Fruge argues there are more protected disclosures. Pl.'s Opp. at 24–30. Fruge notes that in 2018, she told Lawler and Eichner that she believed Hodges was harassing her in retaliation for

reports Fruge had previously made and that she believed the performance warning was retaliation for her earlier reports. *Id.* at 24; *see* Pl.'s Ex. 1 ¶¶ 27, 32. And Fruge contends that reporting retaliatory harassment for whistleblowing activity is itself a report of a possible violation of law or regulation, namely 12 U.S.C. § 1831j.[13] She also says that her 2015 disclosures included actual, or at least possible, abuses of authority, including favoritism and harassment of others.

Turning first to the reports of actual or possible violations of law, the parties appropriately agree that Fruge's disclosure of Ferrari's marijuana consumption and charging purely personal travel expenses to the Board were both protected disclosures. A more difficult question is Fruge's contention that reporting suspected retaliation for whistleblowing activity is itself a protected activity under 12 U.S.C. § 1831j. The Board admits that "it is conceptually true that reporting retaliatory harassment for having made disclosures protected by [§] 1831j is a report of a possible violation of law." Def.'s Reply at 5. But the Board would condition protection for such disclosures on having first made a legitimately protected disclosure. *Id.* The Board would also seem to require that the initial protected disclosure concerned the subsequent retaliator. *See id.* ("[B]efore any such allegation of retaliation can qualify as a standalone protected disclosure, Plaintiff must *first* demonstrate that she made protected disclosures implicating Ms. Hodges.").

The Court declines to follow the Board's suggested approach. First, there only needs to be a possibility that the prior disclosure was protected. If so, a disclosure that an employee was possibly subjected to retaliation for that prior disclosure is itself a disclosure of a possible violation of law. Second, the prior disclosure need not be about the retaliator. It is well-established—and

---

[13] Fruge also contends that she reported a possible violation of law when she alleged *Hodges* engaged in unnecessary Board-funded travel for her personal gain. Pl.'s Opp. at 26. But she made no such report. *See* Pl.'s Ex. 28 at 264–65 (describing Hodges's travel to San Francisco on Board business which happened to also coincide with Hodges's ability to travel home to San Francisco). The facts, even if true, would not plausibly amount to a violation of law.

obvious—that people can have retaliatory motives for allegations made against one's friends, co-workers, and employers.

Here, Fruge argues that her 2018 disclosures—about Hodges's harassment and the performance warning being retaliation for prior disclosures—were themselves protected as disclosures of possible retaliation.  *See* Pl.'s Ex. 1 ¶¶ 27, 32.  The Court disagrees, though it is a close call.  Fruge contends that she disclosed to Lawler that Hodges's harassment occurred in retaliation for prior disclosures about Hodges.  Pl.'s Opp. at 24.  Those disclosures included reports that Hodges and Ferrari were engaged in a "personal relationship that is prohibited by Board policy," that Hodges received an undeserved promotion, and that Hodges had a poor work ethic.  Pl.'s Ex. 28 at 6–10.  None of those disclosures were even possibly protected, so reporting retaliation for those disclosures is not a report of a possible violation of law.  As for the performance warning, Fruge argues in reliance on her own declaration that she disclosed to Eichner that the warning was issued in retaliation for previous reports, but she does not identify which reports or who they were about, beyond the fact that the reports were made in 2014/2015 and 2016.  Pl.'s Opp. at 24; Pl.'s Ex. 1 ¶ 32.  Without this specificity, a reasonable factfinder cannot conclude that she disclosed a possible violation of law.  *See Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 375 (D.C. Cir. 2020) (stating that "an affidavit lacking specific facts or support from the record" may be "insufficient to create a genuine factual issue").

.*     *     *

As to the other types of protected disclosures—regarding *actual* gross mismanagement, gross wastes of funds, and abuses of authority—Fruge relies only on claimed abuses of authority.  *See* Pl.'s Opp. at 26–30.  The statute does not define "abuse of authority," but similar statutes define it as "an arbitrary and capricious exercise of authority that is inconsistent with the mission

28

of the . . . agency concerned."  41 U.S.C. § 4712.  Some courts and the Merit System Protection Board have included a requirement that the action adversely affects someone's rights, leads to personal gain, or benefits some preferred person.  *See, e.g.*, *Doyle v. Dep't of Veterans Affs.*, 273 F. App'x 961, 964 (Fed. Cir. 2008).  Moreover, as explained above, the statute protects only *actual* abuses of authority, and only concerns itself with substantial, not *de minimis*, allegations of wrongdoing.

None of Fruge's purported disclosures of claimed abuses of authority meets this definition. Fruge disclosed claims of harassment, aggressive management styles, and her perception of incompetence on the part of her supervisors and peers.  *See* Pl.'s Opp. at 26–27; Pl.'s Ex. 28.  And she made repeated complaints of favoritism, but the substance of those complaints is either vague and conclusory or trivial.[14]  But "vague, conclusory or facially insufficient allegations" do not constitute protected disclosures.  *See Johnston v. Merit Sys. Prot. Bd.*, 518 F.3d 905, 910 (Fed. Cir. 2008) (interpreting analogous statute).  The Court declines to sit as a "super-personnel department" to weigh appropriate management styles or resolve petty workplace squabbles.  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quotation omitted).  Fruge's trivial disclosures of abuse of authority are not protected.

### B.  Fruge Suffered Few Adverse Employment Actions.

The Board argues that the only adverse employment actions are Fruge's latest performance reviews and her ultimate separation.  Def.'s Mot. at 36–38.  The Board suggests the relevant standard comes from Title VII and its test for an adverse employment action for discrimination.

---

[14] As one example, Fruge complained that Lambert took Ferrari golfing with him without inviting the other analysts.  Pl.'s Ex. 28 at 11.

*Id.* at 36 n.16.  The Board reasons that both statutes use the phrase "terms, conditions, or privileges of employment."  12 U.S.C. § 1831j(a); 42 U.S.C. § 2000e-2(a).[15]

Fruge contends that the relevant adverse employment actions also include the critical feedback she received, the abrupt and public removal from the Chicago review, and the hostile work environment.  Pl.'s Opp. at 31.  She asserts that the Court should import the Title VII retaliation standard.  *Id.* at 30.  That provision is somewhat more expansive and prohibits actions that are materially adverse to a reasonable employee—actions that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted).

The Court agrees with the Board that the appropriate legal standard is the Title VII discrimination provision.  Both statutes use the phrase "terms, conditions, or privileges of employment," 12 U.S.C. § 1831j(a); 42 U.S.C. § 2000e-2(a), whereas the Title VII retaliation provision does not.  *See* 42 U.S.C. § 2000e-3(a).  "[W]hen Congress uses the language of one statute in another statute it usually intends both statutes to have the same meaning."  *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1249 (D.C. Cir. 2004).  And the Court of Appeals has suggested that similar reasoning applies to an analogous retaliation statute.  *See Taylor*, 132 F.3d at 764 (concluding the same for another statue that also uses the phrase "terms, conditions, or privileges of employment" (quotation omitted)).

---

[15] The Amended Complaint could be interpreted as alleging that only the four actions specifically listed in Counts I–IV constitute adverse employment actions:  (1) her termination; (2) the October 31, 2018 Performance Warning Feedback Memorandum; (3) the December 14, 2018 Performance Warning Feedback Memorandum; and (4) a hostile work environment and harassment from October 2015 to her termination.  But the Board does not advance that argument.  *See* Def.'s Reply at 12–13.

The Title VII discrimination standard (and thereby the § 1831j standard) is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998). The Court of Appeals has recently held that the Title VII provision does not require "objectively tangible harm." *Chambers v. D.C.*, 35 F.4th 870, 875 (D.C. Cir. 2022) (quotation omitted). This leaves the law somewhat unsettled. But it is still the case that simple "public humiliation or loss of reputation does not," without more, "constitute an adverse employment action under Title VII." *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002); *see Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002); *Chambers*, 35 F.4th at 877–78 (explaining that "an abusive working environment amounts to a *constructive* alteration in the terms or conditions of employment only if harassment is severe or pervasive" (quotation and brackets omitted)). And it is insufficient to assert that a supervisor uses "a harsh, critical, and condescending tone, and allegedly singl[es] out [the plaintiff] for criticism" unless the plaintiff can "explain how this harsh tone was significantly more severe or pervasive than any other rude or demanding boss." *Dudley v. WMATA*, 924 F. Supp. 2d 141, 171 (D.D.C. 2013).

Applying this standard yields a few adverse employment actions within the two-year limitations period. 12 U.S.C. § 1831j(b) (providing for a limitations period of two years); Compl. (initiating suit on October 2, 2020); *see also* May 17, 2022 Hr'g (Board asserting that statute of limitations bars additional adverse employment actions). The parties agree that Fruge's termination and final performance review (including the follow-ups from the performance warning) are relevant employment actions. It is less clear whether Fruge's removal from leadership of the Chicago review is also an adverse action. *Chambers v. D.C.* held that lateral job transfers can be adverse employment actions. 35 F.4th at 882. Fruge's removal is a reassignment rather than a transfer, but her change of responsibilities was significant and detrimental to her

career trajectory.  The Court concludes that it is an adverse employment action (or, more precisely, that a factfinder could conclude that it is).

None of Fruge's assertions of harassment, harsh words, or a hostile workplace, however, constitute adverse employment actions.  *See* Pl.'s Opp. at 30–31.  Fruge argues the criticism she received was "excessive," but she has not pointed to any evidence demonstrating that the criticism or harsh words were anything different from any ordinary rude or demanding boss.  *Id.* at 31; *see Dudley*, 924 F. Supp. 2d at 171.  Again, the Court does not sit as a "super-personnel department" to weigh appropriate management styles or resolve petty workplace squabbles.  *See Barbour*, 181 F.3d at 1346 (quotation omitted).  Nor, for that matter, has Fruge shown that any such harassment occurred within the limitations period.

*     *     *

In her brief opposing the Board's summary judgment motion, Fruge did not argue that her failure to be promoted in early 2017 was an adverse employment action.  Instead, her brief discussed the non-promotion only in the facts section and as evidence of Eichner's retaliatory motive.  At argument (upon the Court's question) Fruge raised and clearly adopted the argument that the failure to promote her was an adverse action.  *See* May 17, 2022 Hr'g.  And Fruge argued that she only learned of the failure to promote during discovery, such that it's not outside the relevant statute of limitations given the discovery rule.  *See Harris v. Ladner*, 828 A.2d 203, 205–06 (D.C. 2003) ("Under the discovery rule, a cause of action accrues for limitations purposes when the plaintiff has either actual notice of her cause of action or is deemed to be on inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice." (quotation omitted)).

"Generally, arguments raised for the first time at oral argument are forfeited." *U.S. ex rel. Davis v. D.C.*, 793 F.3d 120, 127 (D.C. Cir. 2015). And "[i]t is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004). The Court concludes that, by failing to raise it in her opposition brief, Fruge forfeited the contention that failure to promote her in 2017 was a relevant adverse employment action. *See* Pl.'s Opp. at 30–31. While Fruge adopted the position at argument (after questioning by the Court), omitting it from her opposition prejudiced the Board from being able to reply to it.[16]

### C.  No Reasonable Factfinder Could Conclude that Fruge's Protected Disclosures Contributed to the Adverse Actions.

The Board contends that Fruge cannot demonstrate a causal nexus between any protected disclosures and any adverse employment actions. *See Iglesias v. U.S. Agency for Int'l Dev.*, No. 17-285, 2018 WL 4954148, at *12 (D.D.C. Oct. 12, 2018) (requiring "evidence connecting that animus, whether circumstantial or otherwise, to the disclosures asserted"). It analogizes this case to *Cosgrove v. Federal Home Loan Bank of New York*, in which the court found that despite the employee's self-assessment of "exemplary" performance, there was a well-documented history of performance deficiencies, including "poor attitude and aggressive behavior," and no evidence that the agency "actually treated plaintiff differently" for the claimed protected disclosures. Nos. 90 CIV. 6455, 92 CIV. 4225, 1999 WL 163218, at *9–10 (S.D.N.Y. Mar. 23, 1999). The Board also

---

[16] The Board did respond to Fruge's use of the incident as evidence of Eichner's animus, and it addressed the facts of the situation in a footnote. Def.'s Reply at 15–16 & n.4. But it never squarely addressed whether the non-promotion was an adverse employment action—and never had reason to—because Fruge did not raise the argument in her brief.

notes that a retaliatory motive cannot be inferred from a course of action (including interpersonal conflict and Fruge's performance ratings) that began well before the protected activity.

Fruge responds that she only needs to supply evidence that the protected disclosures were a *contributing factor* to the adverse actions. Pl.'s Opp. at 31; *see Haley*, 953 F. Supp. at 1094 ("A contributing factor means any factor which alone, or in connection with other factors, tends to effect, in any way, the outcome of the decision. Any weight given to the protected disclosure, either alone or in combination with other factors, can satisfy the contributing factor test." (quotation omitted)). She contends that retaliatory motives are evidenced through manifestations of animus and because some adverse actions occurred with temporal proximity or at the first opportunity for retaliation. Pl.'s Opp. at 32–38.

The Court agrees with the Board. Fruge has not provided sufficient evidence for a reasonable factfinder to conclude that any adverse action was motivated by retaliation for any of the protected disclosures. To the contrary, it is well documented that when Fruge made protected disclosures, the Board treated Fruge *better*, gave her *higher* performance ratings, and considered promoting her.

Fruge devotes the most pages to her assertion that Director Eichner evidenced retaliatory motives. She notes that after she first made her reports, Eichner wrote "[w]e may well have a problem with Laurie" and that employees that make unsubstantiated allegations "ha[ve] some explaining to do." Pl.'s Ex. 29 at 843. And she notes that Eichner declined to promote Fruge because of the negative effect the OIG investigation had on employee morale (and because a new temporary manager was starting). Eichner Tr. at 42:3–13. In 2017, Eichner considered putting Fruge on a performance improvement plan (though he ultimately decided not to), and in 2018 he encouraged giving her a performance warning and then to "get her gone." Burr Decl. ¶¶ 5–6; Pl.'s

Ex. 24 at 3243. And later that year he was dismissive to Fruge's report of Hodges's retaliatory harassment. Pl.'s Ex. 33.

But nothing Fruge points to could, when viewed in context, lead to a reasonable inference of retaliation. From first hearing of Fruge's allegations, Eichner said, "I want to play this down the middle of the fairway after getting some more guidance from" a Board attorney. Pl.'s Ex. 29 at 843. To be sure, he expressed skepticism towards some of Fruge's allegations given they had not previously been substantiated (as all managers might—lobbing uncorroborated allegations at co-workers cannot be good for company morale). But he took them seriously. And Eichner (and the Board) went out of the way to protect Fruge—removing Ferrari from her performance review, raising her performance rating, and even suggesting a promotion. *See* Eichner Tr. at 33:4–35:16. Far from being *upset* with Fruge, the record shows Eichner thankful and appreciative. Def.'s Ex. 59. No reasonable factfinder could look at the record and conclude that Eichner had a long-running secret animus against Fruge for her protected disclosures. *Cf. Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 156 (D.D.C. 2013) (concluding that a remark did not show any retaliatory animus in light of supervisor's issuance of a positive performance evaluation); *Waterhouse v. D.C.*, 298 F.3d 989, 996 (D.C. Cir. 2002) (citing Second Circuit's reasoning that "when the person who made the decision to fire" the plaintiff was the same person who previously made a favorable employment decision vis-à-vis the plaintiff, "it is difficult to impute to [the manager] an invidious motivation that would be inconsistent with the decision" (quotation omitted)).[17]

---

[17] Fruge conceded that Eichner was never the subject of any of her alleged protected disclosures, and when asked whether she believed "anyone else" retaliated against her, responded merely that Eichner "made some questionable judgment calls" related to Hodges's promotion to manager—a management decision unrelated to any protected disclosures. *See* Def.'s Ex. 163 at 3; Fruge Tr. at 149:7–150:14.

Even if Fruge's 2018 accusations of retaliation were protected disclosures, no reasonable factfinder could conclude Eichner was influenced by them.  To be sure, Eichner seemed to agree that Fruge made the assertion because she was "trying to find ways to put pressure" on Hodges and Lawler, and he did not start an additional investigation into them.  Pl.'s Ex. 33 at 4087.  But Eichner knew that the performance warning was not retaliatory but was well-founded in complaints and observations supported by neutral parties.  In any event, Fruge herself argues that Eichner had already made up his mind to terminate Fruge *before* these disclosures.  *See* Pl.'s Opp. at 33–34.

Fruge next contends that a factfinder could infer Hodges was outraged and humiliated by Fruge's accusation that Hodges had engaged in an inappropriate relationship with Ferrari.  After all, Hodges reported Fruge to Employee Relations soon after learning of Fruge's disclosures.  Def.'s Ex. 42; Pl.'s Exs. 2–3.  Fruge and other employees also observed that Hodges was badgering and aggressive towards Fruge.  Fruge Tr. at 77:11–22; *id.* at 67:14–17 (Goldin told Fruge that "[Hodges] is mean to everybody, but you get it 100 times worse than anybody.").

But retaliatory motives cannot be inferred from a course of action that began prior to protected activity.  *See Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 349 (4th Cir. 2014); *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 70 (D.D.C. 2003).  And Fruge admits that she and Hodges had an acrimonious relationship long before any protected disclosures.[18]  Absent "evidence that [protected] conduct changed the bitter status quo in any way," there can be no finding that

---

[18] To the extent Fruge alleges an uptick in Hodges's abrasive treatment of her after making protected disclosures, Fruge has not provided any specificity as to how Hodges treated her differently after the disclosures, only making general assertions that "the amount of disagreement with [her] in team meetings increased slightly" and "just continued to escalate over the years." Fruge Tr. at 78:2–9; *see also id.* at 107:5–108:5 (stating that the allegedly hostile work environment dated back to when Hodges received promotions and division awards under Ferrari's leadership, the first of which occurred in February 2012, *see* Def.'s Ex. 19).

retaliatory animus on the part of Hodges was a "contributing factor" to her actions. *Feldman*, 752 F.3d at 349 (upholding summary judgment against whistleblower where there was preexisting hostility between the whistleblower and the alleged retaliators).

But more fundamentally, Fruge's own theory of Hodges's motivation fails. Fruge asserts that Hodges was motivated because Fruge claimed Hodges was in a relationship with Ferrari. Pl.'s Opp. at 35. But as noted above, Fruge has not demonstrated that that allegation was a protected disclosure. She has not shown what law or regulation such a relationship would have violated, or even a possibility that the relationship itself violated a law or regulation. And, as noted, her general assertions of favoritism are too vague or trivial to be protected. The 2018 allegations of retaliation for the disclosures related to the OIG investigation is a closer call. But again, the disclosures about the relationship were not protected, and even if they were, Fruge has not provided evidence that Hodges was a material decisionmaker in any adverse actions after that point.[19]

Fruge also argues that Lambert harbored animus against Fruge because Eichner gave Lambert negative feedback in his performance evaluation. *Id.* at 35–36. And, she argues, this animus manifested itself in Lambert's blocking of Fruge's promotion in 2017. *Id.* But no reasonable factfinder could credit this theory for many of the same reasons already discussed. Close in time to Ferrari's exit (and any concern Lambert felt for his direct report's bad acts being exposed), Lambert encouraged Fruge's promotion and, as Eichner recounted, Lambert said Fruge

---

[19] Fruge argues that as soon as Hodges had an ability to act against Fruge, she did so. The theory goes that once Hodges became her supervisor, Hodges tried to force Fruge out through manufactured criticisms, a performance warning, an unsuccessful performance rating, and separation. Pl.'s Opp. at 38. While a plausible-sounding theory—which Fruge only applies to pre-2018 protected disclosures—no reasonable factfinder could buy it. For one, as noted, Fruge's theory of Hodges's motivation is not based on a protected disclosure. And second, it is abundantly clear from the record that neither Hodges nor any other relevant decisionmakers were negatively influenced by the actual protected disclosures.

was "rising to the occasion as if a weight has been removed from her" after Ferrari's termination. Pl.'s Ex. 30 at 1972 (quotation omitted).  Fruge points to no later evidence that Lambert had any retaliatory motive.  Mere speculation of retaliatory motives is insufficient to withstand summary judgment.  *See Rouse v. Farmers State Bank of Jewell, Iowa*, 866 F. Supp. 1191, 1209 (N.D. Iowa 1994) (failing to meet § 1831j's prima facie burden where the plaintiff "presented the court with no evidence but his suspicion that his disclosures, and not displeasure . . . with his performance, caused his discharge").

And Fruge admits that Lawler—the most important decisionmaker in Fruge's removal from the Chicago review—had no independent retaliatory motivation.  *See* Pl.'s Opp. at 36.  She contends that a reasonable trier of fact could conclude that Lawler, being a new employee, went along with the direction that Eichner and Hodges had long planned.  But that is mere speculation. Lawler documented his own observations, and the record is clear that he was given authority to be an independent decisionmaker.  *See* Def.'s Exs. 128, 150.

Importantly, any factfinder would have to consider any purported retaliatory motivations against the sea of evidence from admittedly neutral observers.  Liu, Burr, Osborne, Employee Relations staff, and the commenters from the various Reserve Banks agreed with the views of Eichner, Hodges, Lambert, and Lawler.  Many such observations have been thoroughly documented and presented to the Court.  A reasonable trier of fact would have to conclude that none of the adverse employment actions was impacted by retaliatory motivations.[20]

\*       \*       \*

---

[20] Fruge asserts that Ferrari and Lambert's 2015 rating of Achieves/Meets Most was the first opportunity for them to retaliate for her disclosures to Roseman, and that Hodges reported Fruge to Employee Relations in 2016 as soon as she heard of Fruge's disclosures.  Even if both were true and there was a valid retaliatory inference, both are well beyond the two-year statute of limitations.

As for her non-promotion in 2017, even if Fruge had not forfeited the contention that it was an adverse employment action, no reasonable factfinder could conclude that it was taken for retaliatory purposes. Fruge asserts that Eichner decided not to promote her because Lambert would oppose it and there were hard feelings in the division due to the OIG investigation. Pl.'s Opp. at 15. In support of her claim, Fruge relies on an email from Eichner to Liu, in which Eichner said that he was in favor of promoting Fruge, but mentioned "I suspect it might take Michael [Lambert] some time to get his mind around the idea, let alone draft the memo." Pl.'s Ex. 30 at 1971. Eichner explained at his deposition that this meant "[e]verything was, frankly, quite raw down there" after Ferrari had been terminated. Eichner Tr. at 42:7–13. This could suggest that management's cognizance of the staff's reaction to the OIG investigation deterred Fruge's promotion. But later that same day Eichner talked to Lambert and then followed up with another email to Liu, stating with regard to promoting Fruge:

> Michael was not opposed at all, and in fact said that she has been "rising to the occasion as if a weight has been removed from her." He suggested that we might want to wait until Amy [Burr] arrives, who he said fully appreciated both Laurie's strengths and rough edges. I told him that was fine with me but, absent a compelling reason to do otherwise, I'd like to promote [Fruge] in the next three months.

Pl.'s Ex. 30 at 1972. Rather than retaliation against Fruge, it is clear all parties were in favor of promoting her.

No reasonable factfinder could conclude that there was any retaliation designed to prevent Fruge's promotion. Indeed, it is hard to see how a factfinder would not draw the exact opposite inference. Fruge had the same position and the same grade for fourteen years and then, just three weeks after her supervisor was terminated because of Fruge's disclosures, the section's leadership agreed with a plan to *promote* Fruge. If anything, a reasonable factfinder would conclude that leadership rallied around her because of her protected disclosures. To be sure, the plan to promote her eventually fell through. But that brings the timeframe farther from the protected disclosures

and introduces more intervening causes (namely, the interpersonal strife at the beginning of Burr's

tenure).

*     *     *

Fruge contends that the foregoing are all genuinely disputed material issues of fact.  Pl.'s

Opp. at 39.  But even on a dry record, the facts are clear.  No reasonable factfinder could conclude

that Fruge's protected disclosures contributed to the adverse employment actions that she

experienced.

## II.   Even If Fruge Could Establish a Prima Facie Case, the Board Has Established that It Would Have Terminated Fruge Anyway.

The Board also argues that it would have taken the same actions with respect to Fruge

regardless of her protected disclosures.  Def.'s Mot. at 43–44.  It emphasizes that manager after

manager identified performance concerns with Fruge and that the Board eventually took action

based on critical feedback from (1) officials separated from any protected disclosures; (2) an

independent facilitator; and (3) many Reserve Bank officials who had no knowledge of Fruge's

complaints.  The Board argues that it's simply not possible for a reasonable trier of fact to look at

all the evidence that has been marshaled and conclude that the actual reason for the Board's actions

was a secret retaliatory motive.  And, the Board adds, summary judgment is further justified given

the undisputed evidence that Fruge had been repeatedly warned that her manner of interacting with

others was inappropriate and that there is no evidence of any marked changes in that behavior.

Fruge contends that her communication issues persisted for years but there was never an

adverse impact on her performance rating and she was never subject to disciplinary actions.  Pl.'s

Opp. at 39–41.  According to Fruge, the only thing that changed was her protected disclosures.

The Court agrees with the Board.  The breadth, depth, and specificity of the Board's

evidence would require any reasonable factfinder to conclude that the Board would have taken the

same steps regardless of her disclosures.  Fruge assesses her own performance as successful and thus seems to contend that the Board's justification for firing her is pretextual.  *Id.* at 39.  But "[t]he question is not whether the underlying" poor performance "occurred; rather, the issue is whether *the employer honestly and reasonably believed* that" Fruge was not meeting the Board's expectations.  *See Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008).  Fruge has failed to demonstrate that a reasonable factfinder could find the contrary.

Fruge's termination and the other adverse actions leading up to it clearly resulted from the perceived shortcomings in her performance, independent of her protected disclosures.  Any reasonable factfinder that examines the record would have to conclude that the Board bent over backwards to ensure Fruge was treated fairly, was evaluated by neutral parties, and was given every reasonable opportunity to succeed.

### Conclusion

For the foregoing reasons, the Court grants the Board of Governors' motion.  An order will issue contemporaneously with this opinion.

DATE:  September 29, 2022

_____
CARL J. NICHOLS
United States District Judge